# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

CAROL BERNERT,

    Plaintiff,                                Case No. 10-12359

v.                                             Hon. Gerald E. Rosen

STATE FARM FIRE AND CASUALTY
COMPANY,

    Defendant.

_____/

**OPINION AND ORDER REGARDING**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     March 29, 2012

PRESENT: Honorable Gerald E. Rosen
                    Chief Judge, United States District Court

## I. INTRODUCTION

Plaintiff Carol Bernert commenced this action in state court on February 10, 2010, seeking to invoke an appraisal provision in a homeowner's insurance policy issued to her by Defendant State Farm Fire and Casualty Company. Through this appraisal procedure, Plaintiff sought to resolve a dispute with Defendant concerning the appropriate amount of insurance benefits owed to her as a result of water damage sustained to her home on January 17, 2009. Defendant removed the case to this Court on June 15, 2010, citing the parties' diverse citizenship and alleging that the statutory amount-in-controversy

requirement was satisfied by virtue of a difference of over $90,000 in the parties' estimates of the cost to repair the damage to Plaintiff's residence. Following removal, Plaintiff amended her complaint to assert state-law claims of breach of contract and violation of a provision in Michigan's Insurance Code that mandates prompt payment of claims. *See* Mich. Comp. Laws § 500.2833(1)(p).

Through the present cross-motions, each party seeks an award of summary judgment in its favor on Plaintiff's claims for insurance coverage. In support of her motion, Plaintiff contends that the Michigan Insurance Code dictates a reading of her homeowner's insurance policy as paying full replacement cost — that is, the full amount expended to repair the water damage to her home, using new materials that are of the same or similar type and quality as those found in her home prior to the damage. Plaintiff further argues that the deductible she must pay under the policy is limited to three percent of the amount of her loss, rather than three percent of the overall policy coverage limit as contended by Defendant. For its part, Defendant maintains that the language of Plaintiff's policy is clear and unambiguous, and that this policy pays only the cost of repair using common construction techniques and materials, as opposed to the custom materials used to construct Plaintiff's historic home.

These cross-motions have been fully briefed by the parties. Having reviewed the parties' motions, briefs, and accompanying exhibits, the Court finds that the relevant allegations, facts, and legal issues are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will

decide the parties' cross-motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  This opinion and order sets forth the Court's rulings on these motions.

## II.  FACTUAL BACKGROUND

The pertinent facts in this case are undisputed.  Plaintiff Carol Bernert owns a home at 2535 Iroquois Street in Detroit, Michigan.  This residence is a 12,000-square-foot home that was built in 1914 and is located in the city's historic Indian Village neighborhood.  As befitting its historic nature, Plaintiff's home includes such features as teak wood flooring and custom plaster and paneling.  Plaintiff and her late husband purchased the Iroquois residence for $42,500 in the early 1980s, via a land contract that was paid off in full.  She subsequently refinanced the property, and had a mortgage balance of approximately $700,000 at the time of her deposition in this case.

In or around August of 2007, Plaintiff obtained a homeowner's insurance policy for the Iroquois property from Defendant State Farm Fire and Casualty Company.  At the time, Defendant determined that the cost to replace Plaintiff's dwelling in the event of a total loss would be over $1.1 million.  Plaintiff, however, selected a coverage limit of $701,700, (*see* Defendant's Motion, Ex. C, Policy Renewal Certificate), or roughly 59 percent of the total cost of replacement as determined by Defendant, with this lower amount presumably deemed sufficient to satisfy the outstanding balance on Plaintiff's mortgage and thereby protect the mortgagee's interest.  Plaintiff also selected a deductible that was identified in the policy declarations as "3.00%  21,051," (*id.*), with the latter

figure representing three percent of the total coverage limit of $701,700.

The declarations page of Plaintiff's homeowner's insurance policy identified the coverage on her dwelling as "A2 Replacement Cost - Common Construction." (*Id.*) The policy defines "A2 Replacement Cost - Common Construction" coverage as follows:

> We will pay the cost to repair or replace with common construction and for the same use on the premises shown in the Declarations, the damaged parts of the property covered under SECTION I - COVERAGES, COVERAGE A - DWELLING, except for wood fences, subject to the following:
>
> (1)   we will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction. We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality.

(Defendant's Motion, Ex. C, Policy at 11.)

Defendant offers a second type of coverage, which it refers to as "A1 Replacement Cost - Similar Construction" coverage. A provision in Plaintiff's policy defines this "A1" coverage as follows:

> We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I - COVERAGES, COVERAGE A - DWELLING . . . .

(*Id.*) This provision lacks any language limiting the cost of repair or replacement to "common construction techniques and materials commonly used by the building trades in standard new construction," as is found in the policy's description of "A2" coverage.

On January 17, 2009, Plaintiff's Iroquois residence sustained extensive water damage as a result of a broken pipe. In light of the "A2" coverage provided under

Plaintiff's homeowner's insurance policy, Defendant took the position that it was required to pay Plaintiff the cost to repair the damaged plaster ceilings and walls of her home using drywall, and the cost of replacing the damaged teak flooring using oak or hardwood flooring materials. After withholding a $21,051 deductible, Defendant paid Plaintiff the sum of $15,288.52 for the damage sustained to her residence,[1] plus an additional amount to compensate for the damage to the contents of her home.

In Plaintiff's view, however, she is entitled to be compensated for the full replacement cost of repairing the damage to her home — namely, repair of the damaged plaster ceilings and walls with plaster, and replacement of the damaged teak flooring with teak flooring. Plaintiff further maintains that her deductible should be limited to three percent of the loss she sustained, rather than three percent of the $701,700 overall policy coverage limit. Through her claims in the present suit, she seeks to recover these additional amounts allegedly owed to her under her homeowner's policy, as well as the interest allegedly owed to her under Michigan law as result of Defendant's purported failure to promptly pay the full amounts to which she is entitled under the policy.

### III.  ANALYSIS

**A.     The Standards Governing the Parties' Cross-Motions**

Through the present cross-motions, both Plaintiff and Defendant seek awards of

---

[1] Although Defendant suggests in its motion that it paid $27,387.52 to Plaintiff, the payment log cited as support for this figure instead reflects loss amounts (minus the deductible) of $15,288.52 for Plaintiff's residence and $1,219.64 for its contents, for a total of $16,508.16. (*See* Defendant's Motion, Ex. E, Payment Log.) It is unclear how Defendant derived the higher payment amount set forth in its motion.

summary judgment in their favor on the insurance coverage disputes outlined above. Under the pertinent Federal Rule, "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought," and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

As noted earlier, the parties are in agreement as to the material facts here, and their cross-motions raise only legal issues that are amenable to resolution by the Court as a matter of law. Accordingly, the Court now turns to the questions of law presented in the parties' motions.

**B.   Under the Express Terms of Her Homeowner's Insurance Policy, Plaintiff Is Entitled to Recover Only the Costs Incurred in Repairing or Replacing the Damaged Portions of Her Home Using Common Construction Materials.**

The principal issues raised in the parties' cross-motions concern the proper interpretation of Plaintiff's homeowner's insurance policy and whether this policy comports with the applicable provisions of Michigan's Insurance Code. Defendant

argues that the language of Plaintiff's policy is clear, and that it has paid Plaintiff in accordance with the terms of the policy calling for reimbursement of the costs of repair or replacement of the damaged portions of Plaintiff's dwelling using common construction techniques and materials. Plaintiff, in contrast, contends that the policy interpretation advanced by Defendant would run afoul of the Insurance Code, and that her homeowner's policy must instead be construed as paying the costs to repair or replace the damaged portions of her home using the same or similar materials as those that were damaged. As discussed below, the Court finds that Defendant has the better of the argument on this issue.

The proper interpretation of the terms of Plaintiff's homeowner's insurance policy is a question of law for the Court, provided that the policy is not ambiguous. *See Klapp v. United Insurance Group Agency, Inc.,* 468 Mich. 459, 663 N.W.2d 447, 451, 453-54 (2003). Moreover, "[t]he principles of construction governing other contracts apply to insurance policies," and "[w]here no ambiguity exists, this Court enforces the contract as written." *Farm Bureau Mutual Insurance Co. v. Nikkel,* 460 Mich. 558, 596 N.W.2d 915, 919 (1999). In ascertaining the proper meaning of an insurance policy and determining whether it is ambiguous, the Court must read and interpret the policy as a whole. *See Taylor v. Blue Cross/Blue Shield of Michigan,* 205 Mich. App. 644, 517 N.W.2d 864, 867 (1994). "An insurance contract is clear if it fairly admits of but one interpretation," but it is "ambiguous if, after reading the entire contract, its language reasonably can be understood in differing ways." *Taylor,* 517 N.W.2d at 868. Nonetheless, a policy is not

necessarily ambiguous just because it is "inartfully worded or clumsily arranged," *Raska v. Farm Bureau Mutual Insurance Co.,* 412 Mich. 355, 314 N.W.2d 440, 441 (1982), and "[m]ere disagreement among parties as to the meaning of [policy] terms does not constitute ambiguity," *Equitable Life Assurance Society v. Poe,* 143 F.3d 1013, 1016 (6th Cir. 1998).

In this case, the Court readily concludes that the pertinent terms of Plaintiff's homeowner's insurance policy are clear and reasonably susceptible of only one meaning. The declarations page of Plaintiff's policy expressly identifies the coverage provided under the policy as "A2 Replacement Cost - Common Construction." (Defendant's Motion, Ex. C, Policy Renewal Certificate.) The policy then defines this level of coverage as paying "the cost to repair or replace" any damaged property "with common construction." (Defendant's Motion, Ex. C, Policy at 11.) This same policy provision further states that the Defendant insurer "will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction," but "will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality." (*Id.*) The meaning of this policy language is clear — namely, that Plaintiff's policy provides for repair or replacement of damaged property using common construction techniques and materials, as opposed to custom materials of the same kind and quality as those used in the original construction of the damaged property.

In her motion and her response to Defendant's motion, Plaintiff does not advance a

different reading of this policy language. In particular, she does not contend that the above-quoted policy terms provide for reimbursement of the cost of replacement or repair using the same materials as, or materials comparable in kind and quality to, the custom materials previously found in her historic home. Indeed, it would be especially difficult to construe the terms of Plaintiff's policy as providing this sort of full replacement coverage, where the policy expressly excludes "custom construction" costs from its description of "A2 Replacement Cost" coverage, and where this level of reimbursement is expressly ***included*** in the "A1 Replacement Cost - Similar Construction" coverage that Plaintiff did not select. Likewise, Plaintiff does not argue that the payments actually made to her by Defendant failed to comport with her "A2" policy and its limitation to "common construction techniques and materials," nor does she contend in her submissions to the Court that she was misinformed or misled as to the level or type of coverage provided under her "A2" policy.[2]

Instead, Plaintiff's effort to obtain full "replacement cost" reimbursement rests solely upon the proposition that the "A2" coverage limits contained in her homeowner's policy purportedly are "contrary to the provisions" of Michigan's Insurance Code, and are

---

[2]Plaintiff arguably suggested at her deposition that she was misled as to the type of coverage she was purchasing, (*see* Defendant's Motion, Ex. A, Plaintiff's Dep. at 26-27), but she has not pursued any such argument in her summary judgment motion or in her brief in opposition to Defendant's motion. In any event, the Michigan courts have held that "an insured is obligated to read his or her insurance policy and raise any questions about the coverage within a reasonable time after the policy is issued," and that even "if the insured has not read the policy, he or she is nevertheless charged with knowledge of [its] terms and conditions." *Casey v. Auto Owners Insurance Co.,* 273 Mich. App. 388, 729 N.W.2d 277, 283 (2007) (footnotes with citations omitted).

therefore deemed "absolutely void" under the Code. *See* Mich. Comp. Laws § 500.2860. The starting point of this challenge is the Insurance Code's definitions of a "repair cost policy" and a "replacement cost policy." As to the former, the Code provides:

> "Repair cost policy" means a home insurance policy for which the amount of coverage under the policy is based substantially on the market value of the property, and which provides for payment for repair, rebuilding, or replacement of losses or damages to real property with materials of like kind and quality, without depreciation, pursuant to [Mich. Comp. Laws § 500.2826], or with conventional materials and construction methods, pursuant to the standards of [Mich. Comp. Laws § 500.2827].

Mich. Comp. Laws § 500.2104(2). A "replacement cost policy," in contrast, is defined as a "home insurance policy for which the amount of coverage under the policy is based substantially on the replacement cost of the property, which provides for settlement of losses to real property pursuant to the standards prescribed in [Mich. Comp. Laws § 500.2826]." Mich. Comp. Laws § 500.2104(3).

As indicated in these definitions, a "repair cost policy" within the meaning of the Insurance Code may provide coverage in accordance with either of two statutory provisions. Under the first, the insurer agrees to reimburse the insured for the "amount actually expended to repair, rebuild, or replace [damaged property] with new materials of like size, kind, and quality." Mich. Comp. Laws § 500.2826. Under the second, the insurer agrees to reimburse the insured for the "amount actually necessary to repair, rebuild, or replace the lost or damaged insured property to a condition and appearance similar to that which existed at the time of the loss or damage based on the use of conventional materials and construction methods which are currently available without

extraordinary expense." Mich. Comp. Laws § 500.2827(1). A "replacement cost policy" within the meaning of the Code, however, provides coverage in accordance with § 500.2826 only — *i.e.,* reimbursement of the cost to repair or replace damaged property with "new materials of like size, kind, and quality."

The "A2" homeowner's insurance policy in this case most closely comports with the standards of § 500.2827, as it provides coverage for the cost of repair or replacement of damaged property using "conventional materials and construction methods" — or, as similarly stated in the policy, "common construction techniques and materials." Under the terminology of the Insurance Code, then, Plaintiff's "A2" policy would be properly characterized as a "repair cost policy." Yet, Defendant has designated the coverage under this policy as "A2 Replacement Cost - Common Construction" coverage. In Plaintiff's view, by attaching the "Replacement Cost" label to its policy, Defendant has obligated itself to provide coverage in accordance with the Insurance Code's definition of a "replacement cost" policy — that is, coverage of the cost of repair or replacement "with new materials of like size, kind, and quality." Mich. Comp. Laws § 500.2826. Because the policy at issue here does not provide this level of coverage, but instead provides coverage more akin to a "repair cost policy" as set forth at § 500.2827, Plaintiff argues that the policy should be deemed contrary to the Insurance Code, and thus void.

The Court cannot agree. It is clear that the Defendant insurer here was authorized under the Michigan Insurance Code to issue a homeowner's policy to Plaintiff that limited her recovery for lost or damaged property to "the amount actually necessary to

11

repair, rebuild, or replace the lost or damaged insured property to a condition and appearance similar to that which existed at the time of the loss or damage based on the use of conventional materials and construction methods which are currently available without extraordinary expense." Mich. Comp. Laws § 500.2827(1). As discussed above, the policy actually issued to Plaintiff fits comfortably within these statutory parameters, as it covers the cost of repair or replacement using "common construction techniques and materials commonly used by the building trades in standard new construction," but does not pay the cost to repair or replace "custom construction with like kind and quality." (Defendant's Motion, Ex. C, Policy at 11.) Although this policy provision does not precisely mimic the language of § 500.2827(1), Plaintiff has not endeavored to explain how any minor divergence from the statutory language should render the policy void under the Insurance Code.

      Instead, Plaintiff's effort to void the policy rests solely upon the *caption* Defendant has chosen to place on this policy provision — *i.e.,* Defendant's characterization of the policy coverage as "A2 Replacement Cost - Common Construction." Yet, while the Insurance Code delineates the types of coverage an insurer may offer, *see* Mich. Comp. Laws §§ 500.2826, 500.2827(1), and while it elsewhere defines the terms "repair cost policy" and "replacement cost policy" by reference to these two types of coverage, *see* Mich. Comp. Laws § 500.2104(2)-(3), Plaintiff has failed to direct the Court's attention to any provision in the Code that dictates the *caption* an insurer must place on its coverage provisions. Nor, more generally, has Plaintiff identified any Code provision that

mandates the particular words that must be used to describe coverage that pays the cost of using "conventional materials and construction methods," § 500.2827(1), versus the cost of repair or replacement with "new materials of like size, kind, and quality," § 500.2826.

To be sure, the Insurance Code deems it an "unfair or deceptive act or practice in the business of insurance" to "[m]isrepresent[] the terms, benefits, advantages, or conditions of an insurance policy," or to "[u]se[] a name or title of an insurance policy . . . [that] misrepresent[s] the true nature of that insurance policy." Mich. Comp. Laws § 500.2005(a), (e). The Code further provides, however, that "[a] policy approved by the commissioner shall be conclusively presumed not to misrepresent the true nature of that policy." Mich. Comp. Laws § 500.2005(e). Defendant states without contradiction that the policy at issue here "has been used by [Defendant] in Michigan since 1998, and was approved by the Insurance Commissioner." (Defendant's Response Br. at 8-9). Moreover, the policy itself clearly and explicitly defines its "A2 Replacement Cost - Common Construction" coverage, and it also describes the contrasting "A1 Replacement Cost - Similar Construction" coverage that Defendant offers but Plaintiff did not choose. Against this backdrop, the Court fails to see how Defendant's shorthand characterization of the policy coverage as "A2 Replacement Cost - Common Construction" renders the policy suspect, much less void, under the Michigan Insurance Code.[3]

---

[3]Notably, if Defendant had captioned the coverage conferred under Plaintiff's policy as "A2 Repair Cost," and thereby removed the purportedly misleading reference to "replacement cost" coverage, this alone would not have cured the ambiguity complained of by Plaintiff here. Under the Insurance Code, a "repair cost policy" may provide the coverage described in *either* § 500.2826 (which authorizes "like kind and quality" coverage) *or* § 500.2827(1) (which

Indeed, while Plaintiff wishes to elevate the policy's "A2 Replacement Cost" caption over the language of the policy itself, it is worth noting that the overall amount of coverage chosen by Plaintiff is inconsistent with the Insurance Code's definition of a "replacement cost policy."  Under this definition, one requirement of a "replacement cost" policy is that "the amount of coverage under the policy is based substantially on the replacement cost of the property."  Mich. Comp. Laws § 500.2104(3).[4]  At the time Plaintiff obtained her homeowner's policy, Defendant states without contradiction that the replacement cost of her home was over $1.1 million.  Yet, Plaintiff selected a lower coverage limit of $701,700, which was approximately 59 percent of the total cost of replacement.  This choice, with its attendant lower premiums, further undermines Plaintiff's claim that she is entitled to coverage consistent with a "replacement cost"

---

authorizes reimbursement using "conventional materials and construction methods").  *See* Mich. Comp. Laws § 500.2104(2) (defining a "repair cost policy" as providing either of these two types of coverage).

Consequently, because the costs paid under "repair cost" and "replacement cost" policies do not necessarily differ, an insured must look to the terms of the policy itself to determine the level of coverage provided under a so-called "repair cost" policy.  It is not an especially compelling complaint, then, that the caption of Plaintiff's policy alone did not clarify the level of coverage the policy provided.  Nor is it reasonable to believe that a layperson such as Plaintiff would be so well versed in the Insurance Code that her policy's reference to "Replacement Cost" necessarily would have led her to conclude that the policy provided the coverage specified under § 500.2826, despite its language that more closely tracked the coverage described in § 500.2827(1).

[4]A "repair cost" policy, in contrast, is defined as providing an amount of coverage that is "based substantially on the market value of the property."  Mich. Comp. Laws § 500.2104(2).

14

policy as that term is defined under the Michigan Insurance Code.[5] Rather, the Court finds, in accordance with the plain language of Plaintiff's policy, that she is entitled to reimbursement only for the cost to repair or replace her damaged property using "common construction techniques and materials," and the Court sees nothing in the Insurance Code that would override this clear policy language.

## C. Plaintiff's Homeowner's Insurance Policy Unambiguously Sets Her Deductible at Three Percent of the Policy's Coverage Amount, or $21,051.

Plaintiff's remaining argument for an additional recovery under her homeowner's insurance policy warrants only brief discussion. The declarations page of Plaintiff's policy states that the deductible for all losses covered under Section I of the policy is "3.00%  21,051," (Defendant's Motion, Ex. C, Policy Renewal Certificate), with the latter figure reflecting 3 percent of the overall coverage amount of $701,700. When paying Plaintiff's claim arising from the water damage to her home, Defendant first withheld a

---

[5]In fact, Defendant points out that under the Insurance Code, an insurer could have declined to issue a replacement cost policy to Plaintiff unless she elected to "purchase an amount of insurance equal to at least 80% of the replacement cost of the property insured." Mich. Comp. Laws § 500.2103(2)(d); *see also* Mich. Comp. Laws § 500.2117(2)(a) (requiring insurers to issue homeowner's insurance policies based only on the criteria set forth in § 500.2103(2)); Mich. Comp. Laws § 500.2117(2)(i) (identifying this 80% threshold as a permissible ground upon which an insurer may decline to issue a replacement cost policy). An insured who wishes to purchase a repair cost policy, in contrast, need only "purchase an amount of insurance equal to at least 100% of the market value of the property insured." Mich. Comp. Laws § 500.2103(2)(e). As Defendant observes, the clear intent of these and related Insurance Code provisions is "to permit insurer[]s to offer repair cost coverage at a cost less than replacement cost coverage." (Defendant's Response Br. at 7.) By choosing an amount of coverage well below the 80 percent threshold and paying premiums commensurate with this choice, Plaintiff evidently elected to take advantage of this lower cost option made available under the Insurance Code, but at the expense of satisfying the criteria for a "replacement cost policy" as defined under the Insurance Code.

15

$21,051 deductible before paying Plaintiff the sum of $15,288.52 for the damage sustained to her residence. (*See* Defendant's Motion, Ex. E, Payment Log.) Plaintiff, however, contends that the policy should be construed as establishing a deductible equal to 3 percent of the *loss* — in this case, 3 percent of roughly $37,000, or just over $1,000 — rather than 3 percent of the overall amount of policy coverage. The Court readily concludes that this proposed reading of the policy is not tenable.

Plaintiff's argument on this point rests upon a purported ambiguity in the policy, which defines the deductible by reference to two figures, "3.00%" and "21,051." In Plaintiff's view, if Defendant meant to establish a flat deductible of $21,051 for all claims, there was no need to include the "3.00%" language. It follows, according to Plaintiff, that the policy's reference to "3.00%" must be meant to serve a purpose distinct from the reference to "21,051." Yet, the policy fails to specify the amount to which this "3.00%" figure should be applied. Plaintiff suggests that this purported ambiguity should be resolved in her favor and against the drafting insurer, with the policy construed as setting a deductible of 3 percent of the amount of loss, as opposed to 3 percent of the overall coverage amount.

The Court fails to see how any ambiguity arises from policy language that expresses the same deductible amount in two different ways. If the policy referred only to the "21,051" figure, Plaintiff presumably would agree that this policy language would unambiguously establish a flat deductible of $21,051 for all claims. To be sure, the policy's additional reference to "3.00%" presents at least the *potential* for confusion or

16

ambiguity, rather than clarity, because the policy fails to explicitly specify an overall amount or formula to which this 3 percent should apply. Yet, this "3.00%" reference appears immediately below the overall coverage limit of $701,700 and immediately adjacent to the reference to "21,051," and it surely cannot be viewed as a coincidence that 3 percent of the overall coverage limit of $701,700 yields $21,051 — the very amount set forth in the policy immediately after its reference to "3.00%." Thus, any potential mystery associated with the policy's unadorned reference to "3.00%" is easily solved by resort to the immediately adjacent policy language.

      Plaintiff's efforts to create an ambiguity from this language are not persuasive. First, she suggests that Defendant's interpretation of the policy would render its reference to "3.00%" mere surplusage, because the "21,051" figure alone would be sufficient to establish a flat deductible in this amount. As Defendant observes, however, a policy's overall coverage limits often change with each annual policy renewal, and the policy's reference to "3.00%" allows the insured to understand why (and in what amount) the deductible changes as the total amount of coverage changes. The "3.00%" figure, then, serves to inform the insured as to the formula used by the insurer to compute the deductible amount set forth in the policy, and enables the insured to anticipate changes in this deductible amount as the overall coverage limits change over time.

      Indeed, it is Plaintiff's proposed interpretation, rather than Defendant's, that would create a surplus of policy language, or at least engender confusion. Under Plaintiff's preferred construction, the policy's reference to "21,051" would be largely unnecessary

and arguably misleading, as it would represent only the ***maximum*** deductible that could result from Plaintiff's suggested 3-percent-of-loss formula. Yet, there would be no accompanying policy language — *e.g.,* "up to" or "maximum of" — indicating that this "21,051" figure was something other than a flat deductible amount. And, of course, the policy's reference to "3.00%" likewise is unaccompanied by any language indicating that this figure is to be plugged into an amount-of-loss formula. From the surrounding context, then, it can hardly be said that Plaintiff's proposed interpretation of the policy rests upon the most natural reading of the policy language.

Finally, Plaintiff suggests that it would not "make any sense" for her homeowner's policy to set a deductible that would leave her without a recovery for any loss smaller than the deductible amount, or $21,051. (Plaintiff's Motion, Br. in Support at 3.) Yet, this is a routine and wholly appropriate byproduct of flat deductibles, which serve as a floor below which claims will not be made. Like other insureds, Plaintiff surely is familiar with the customary trade-off between higher deductibles and lower premiums, and nothing in the record suggests that she failed to receive the benefit of the bargain she struck with Defendant by selecting the $21,051 deductible set forth in her policy. Accordingly, the Court finds that Defendant acted in accordance with the terms of Plaintiff's homeowner's insurance policy by withholding a $21,051 deductible from the amount paid on Plaintiff's claim under the policy.

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's May 31, 2011 motion for summary judgment (docket #30) is DENIED. IT IS FURTHER ORDERED that Defendant's July 28, 2011 motion for summary judgment (docket # 34) is GRANTED.

                                        s/Gerald E. Rosen
                                        Chief Judge, United States District Court

Dated:  March 29, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 29, 2012, by electronic and/or ordinary mail.

                                        s/Ruth A. Gunther
                                        Case Manager